Belknap,  }
Oct. 3, 1916. }

HERBERT J. JONES, *Ex'r* v. HERBERT C. BENNETT & a.

Though evidence of a testator's habitual use of words may be received as indicating what he meant by their use on a particular occasion, his intention must be gathered from the words used in the will and not from his declarations made before, at the time, or after the will was made.

When no ambiguity exists as to the sense in which a testator's language was used, either in the language itself or in its application to surrounding circumstances, proof by extrinsic evidence that he used it in a peculiar or unusual sense, will not be received to defeat his expressed intent found from the common and usual meaning attached to ordinary language.

The usual meaning or sense of the words or terms used in a will, cannot be contradicted in a proceeding for its construction, by extrinsic proof of an unusual or peculiar sense attached to them by the testator when making his will.

The words in a will, "heirs of my late husband", adequately describe a class and present no difficulty in ascertaining the person intended; and the fact that the testatrix at the time she executed her will, orally gave to the words an unusual meaning, is immaterial upon the question of their interpretation.

PETITION, by the executor of Sarah J. Clark's will for advice as to the construction of the residuary clause, which is as follows: "the

balance of my estate  .  .  .  I direct to be divided equally among the heirs of my late husband, Hiram M. Clark.'' The defendants are Hiram's grandson and his nephews and nieces. The nephews and nieces introduced Mrs. Clark's statements to the scrivener and others to show who were to have the property passing by this clause, and the court considered the evidence on the issue of Mrs. Clark's habit and found that she was not in the habit of speaking of Hiram's nephews and nieces as his heirs but refused to consider it on the issue of her intention and they (the nephews and nieces) excepted. The other facts are sufficiently stated in the opinion. Transferred from the March term, 1915, of the superior court by *Sawyer*, J.

*Owen & Veazey*, for the plaintiff.

*Charles B. Hibbard* and *Shannon & Tilton* (*Mr. Hibbard* orally), for the grandson.

*Peters, Cole & Tilton* (of Massachusetts) and *Hughes & Doe* (*Mr. Doe* orally), for the nephews and nieces.

YOUNG, J. When a person is in the habit of doing a thing in a particular way it is permissible to show that fact, provided it is the best evidence readily obtainable, as tending to prove how he did it on a given occasion; for experience teaches it is more probable than otherwise that a person acted on the occasion in question in the way he was accustomed to act. In other words, habit is an evidentiary fact and whether it exists is a question of fact to be decided like all such questions by the weight of competent evidence. The question, therefore, and the only question raised by the nephews' and nieces' exception to the finding that Mrs. Clark was not in the habit of speaking of them as Hiram's heirs, is whether it conclusively appears that that was her habit or whether that conclusion is the only one of which the evidence is fairly capable. The testimony of the scrivener tends rather to the conclusion that the reason Mrs. Clark used the words in dispute to describe those who were to take the property passing by this clause was because she (the scrivener) thought that Hiram's nephews and nieces were his heirs, than to the conclusion that Mrs. Clark was in the habit of speaking of them in that way. In other words, the scrivener's testimony tends to the conclusion that Mrs. Clark omitted the names of the nephews and nieces from this clause by mistake, and has

little or no tendency to prove that she was accustomed to speak of them as her husband's heirs. The most that can be said of the testimony of the other witnesses in so far as it is relevant to this issue is that it tended to prove Mrs. Clark sometimes spoke of them as his heirs.

If it is assumed that she intended to disinherit her grandson in favor of the nephews and nieces, the probable solution of the problem of why she used these words is, as the court found, that she had but a vague idea of their meaning and used them by mistake.

It will be necessary, therefore, to consider the nephews' and nieces' exception to the court's refusal to consider this evidence on the issue of Mrs. Clark's intention. If it is permissible to show that she omitted the names of the nephews and nieces by mistake or that she supposed they were Hiram's heirs, it is because that fact is a circumstance surrounding the making of the will which it is proper for the court to consider in ascertaining to whom she intended to give this property; consequently the test to determine whether the court erred in excluding this evidence in so far as it tended to prove that Mrs. Clark intended to give this property to the nephews and nieces is to inquire whether, if that were found to be the fact from extrinsic evidence, the court could consider it in construing the will. It is true, as the nephews and nieces contend, that Mrs. Clark's intention is not to be ascertained by simply giving the words she used their ordinary meaning regardless of the circumstances under which they were used (*Kendall* v. *Green*, 67 N. H. 557); but it is equally true that her intention must be gathered from the words she used and not from her declarations made before, at the time, or after the will was made (*Greeley* v. *Society*, 77 N. H. 455, 456); for it is not permissible to ascertain her intention by extrinsic evidence and use it to contradict the words of the will. *Hoitt* v. *Hoitt*, 63 N. H. 475, 500. In other words, construing a will is not ascertaining the testator's intention as an independent fact and reading it into the will, but ascertaining it from the will itself, or from the words of the will, by reading them in the light of the surrounding circumstances. If, therefore, Mrs. Clark had been accustomed to speak of the nephews and nieces as her husband's heirs, it would be permissible for the court to consider that fact in construing her will, for that would tend to prove what the words meant to her. The fact, however, that she did not know their meaning has no such tendency, but rather that they meant nothing to her; consequently, ascertaining to whom she intended to give the property from the statements she

made to the scrivener would not be ascertaining what the words meant to her, but ascertaining the names of those to whom she intended to give this property, from extrinsic evidence.

If the court's finding that Mrs. Clark was ignorant of the meaning of the word "heirs" is intended as a finding that she omitted the names of the nephews and nieces as the beneficiaries in this clause of the will by mistake, they take nothing by the finding, unless the court has power to ascertain from evidence outside of the will whether the names of all the persons the testator intended to benefit are to be found in the will and to supply the names of those it finds were omitted by mistake. The court, however, has no such power; for, while P. S., *c.* 186 authorizes a person to dispose of his property by will, *s.* 2 provides the only way in which that may be done. 4 Wig. Ev., *s.* 2471.

All that is intended when it is said the court is powerless to correct a testator's mistakes is that it has no power to read in the names of beneficiaries omitted by mistake. Whether it has power to read out names inserted by mistake, is a question not considered and as to which no opinion is intended to be expressed.

Since it has been found that Mrs. Clark was not in the habit of using the words in dispute to describe the nephews and nieces, and since if it were found from her declarations that they were the ones she had in mind when she used these words, they would take nothing by the finding because of the statute; the only things to be considered in ascertaining who takes the property passing by this clause, in addition to the words she used, are the facts that most of the property came to her from her husband and most of his property came to him from a brother; that she knew he wished his nephews and nieces to have a substantial part of his property; that she disliked her son-in-law's family and was very friendly with the nephews and nieces and that she gave her grandson the income of three thousand dollars and so much of the principal as is necessary for his support, in the first clause of the will; and, in the second, gave one hundred dollars to each of the nephews and nieces. All these facts are relevant to the issue of her intention but they have little tendency to prove that her grandson was not to have the residue of her property if he outlived her. The fact she created a trust for his benefit has little, if any, more tendency to prove that she did not intend him to have the residue of her property, than the fact she gave each of the nephews and nieces one hundred dollars has to prove that she did not intend them to have it, if they chanced to be her

husband's heirs when the will became operative. There are twelve nephews and nieces and there is nothing to show that Mrs. Clark did not think twelve hundred dollars was a substantial part of her husband's property.

While the fact Mrs. Clark disliked her son-in-law's family tends to explain why she gave the residue of her property to her husband's as distinguished from her grandson's heirs, it has little or no tendency to prove that she intended to benefit the nephews and nieces at the grandson's expense. In fact the only evidence worthy of serious consideration, or the only evidence which has any substantial tendency to prove that Mrs. Clark did not intend her grandson to have this property if he outlived her is the scrivener's testimony, that Mrs. Clark told her she wished to give this property to her husband's nephews and nieces; but if that were found to be the fact, they would still be remediless because of the statute.

The plaintiff is advised that the property passing by the residuary clause goes to Bennett.

*Case discharged.*

All concurred.

Upon the motion of the nephews and nieces for a re-hearing, a further hearing was had upon briefs and arguments, and the following opinion was filed.

WALKER, J. The contention that it was error for the superior court to refuse to consider evidence of the declarations of the testatrix at the time of her execution of the will, upon the question of her intention or understanding in using the words "heirs of my late husband" as descriptive of the legatees, cannot be sustained, unless the court is to assume the function of legislation. That the evidence tends to show that she intended by the above phrase the nephews and nieces of her deceased husband, and that she supposed they were correctly described as his heirs, may be conceded. The fact is, as judicially understood, they were not his heirs. Can the usual meaning or sense of that term as used in the will be contradicted in a proceeding for the construction of the will by her declarations of the sense she attached to it? This is not a question of the relevancy of the evidence or its weight. We are not concerned with its logical probative value. 4 Wig. Ev., s. 2400. If it proves that she made a mistake in her use of terms to express the objects of her bounty, the court is not authorized to rectify her mistake by disregarding a

rule of substantive law which provides that a will shall be in writing (P. S., *c.* 186, *s.* 2), and cannot be contradicted, upon the issue of the testator's intention, by extrinsic evidence. In this respect the construction of a will does not materially differ from the construction of written contracts or other documents. The object is to ascertain the sense in which the written language was used by the parties in a contract or by the testator in a will. The question is, "not what the parties intended to do, but, What did they do?—what intention did they express in the deed?" *Pillsbury* v. *Elliott*, 56 N. H. 422, 425. "The construction of the will is the ascertainment of the testator's expressed intention,—what he meant by what he said,— which is to be determined by the court as a question of fact and not by the application of arbitrary rules of law." *Stratton* v. *Stratton*, 68 N. H. 582, 585. A further citation of authorities in support of this proposition in this jurisdiction would be superfluous.

When the expressed intention of the testator plainly appears from the language of the will, it cannot ordinarily be contradicted by proof that his purpose was in fact different from what his written language, as understood by the court, clearly imports; and this is so, not because the proof is logically irrelevant in consequence of some formal statement of the inadmissibility of the evidence which supports the proof, but because it is illegitimate to contradict the written document by the use of independent facts. This principle is often expressed in language more applicable to rules of evidence than to substantive law, as when it is said that parol evidence is not admissible at law to vary or contradict a written document. But the meaning obviously is that it is inadmissible because the fact which it tends to prove cannot be used for any useful purpose. The evidence may be admissible to prove the fact, but the fact is immaterial. Much confusion in discussing the cases upon this subject is avoided by bearing this distinction in mind.

But it is urged that the purpose of the testator, as it appears from the language of the will, is frequently changed, limited and enlarged, or materially modified, by proof of facts not specifically referred to in the will, and in some cases by the oral declarations of the testator; and the conclusion is sought to be justified that the declarations of the testatrix in this case should have been received to show that by the word "heirs" she meant nephews and nieces. But the principle which prevents the use of independent facts *dehors* the will to defeat the sense inherent in the language used by the testator in his will, does not preclude all reference to the surrounding facts and circum-

stances in view of which the will was made. The provisions of the will must be applied to extraneous physical facts which must be identified by proof. The legatees and devisees as well as the subject-matter of the gifts must be ascertained in order to give effect to the will. Such evidence is always received, not to overthrow the provisions of the will and substitute others in their stead, but to sustain those provisions by applying them to the external persons and objects designated in the will, often with great brevity. In *Ladd* v. *Ladd,* 74 N. H. 380, 382, it is said: "It is the general rule that declarations of intention are not admissible to explain what a testatrix meant by the terms employed in her will. . . . But the rule does not preclude a consideration of the attending circumstances as aids in applying the will, for the purpose of ascertaining what was meant by the terms employed." That is, the rule is not so self-contradictory as to authorize a modification of a will by parol and at the same time to declare that it could not be thus modified or changed.

This process of identification merely renders the sense of the testamentary language more complete and practical and is necessary to give effect to the will. "In the simplest case that can be put, namely, that of an instrument appearing on the face of it to be perfectly intelligible, inquiry must be made for a subject-matter to satisfy the description." 1 Gr. Ev., s. 287. "The often announced and applied principle, that the construction of a written document is the ascertainment of the intention of the parties, determined like a question of fact by the natural weight of competent evidence, and not by the application of arbitrary rules, does not authorize the use, as evidence, of matter not proper for consideration in the interpretation of a writing. It does not abolish the well established rule that a written instrument cannot be contradicted or varied by parol extraneous evidence." *Lancaster &c. Elec. Light Co.* v. *Jones,* 75 N. H. 172, 174; *Weed* v. *Woods,* 71 N. H. 581. The evidence is admitted, not to show an intention independent of, and in conflict with, the expressed intention. "In no case is such evidence allowed or considered to change the expressed intent. The proofs afforded by such evidence are employed merely as an aid to the court in determining what in fact was the expressed intent." *Young's Estate,* 123 Cal. 337, 342.

It often happens, however, that the expressed intention when applied to external objects becomes doubtful or ambiguous; the sense of the language as used in the writing is not clear in the absence of

extraneous proof of the sense attached to it by the parties seeking to express their purposes thereby. There exists what is usually denominated a latent ambiguity. That the parties intended to express some purpose is not open to doubt, but in such cases it cannot be practically applied without the aid of extraneous evidence. Hence, such evidence is admissible as a matter of necessity to prevent a finding of indefiniteness and a consequent failure to give any effect to the language,— a result which would defeat the parties' undoubted purpose in executing the document.

In *Trustees &c.* v. *Peaslee*, 15 N. H. 317, a testator made a bequest to the "Franklin Seminary of Literature and Science, Newmarket, N. H." As there was no institution of that name, it was found from extraneous evidence that he intended "The Trustees of the South Newmarket Methodist Seminary." His description of the legatee when applied to external objects was inadequate and meaningless. The language literally understood did not express his intention; but aided by other evidence the court could ascertain what his purpose was when he used that language and hence could give effect to his intention thus expressed. The evidence did not violate the rule against contradicting or modifying the plain and unambiguous language of the will; for it was not plain or unambiguous as disclosed by the circumstances. To the same effect are *Smith* v. *Kimball*, 62 N. H. 606; *Tilton* v. *Society*, 60 N. H. 377. In the case last cited it is said (*p.* 383): "A person known to a testator as A B, and to all others as C D, may take a legacy given to A B." But that is not equivalent to saying that C D might take a legacy given to A B upon the testator's mere declaration that he intended to give it to C D. The decision in that case was based upon the fact of a "latent ambiguity."

But when no ambiguity exists as to the sense in which the testator's language was used, proof by extraneous evidence that he used it in a peculiar or unusual sense, would be to contradict and defeat his expressed intent, found from the common and usual meaning attached to common and usual language; for he must have known or assumed that his language would receive that interpretation. *Kendall* v. *Green*, 67 N. H. 557, 562. It is a general principle based upon sound reason that when the language of a will is plain and unambiguous in view of the attendant circumstances, no intention on the part of the testator is to be sought after other than the one so expressed. *Greenough* v. *Cass*, 64 N. H. 326; *Utley* v. *Titcomb*, 63 N. H. 129; *Emery* v. *Haven*, 67 N. H. 503. Whether the old Baco-

nian distinction (Br. Leg. Max. *608) between latent and patent ambiguities in wills justifies the admissibility of parol evidence of intention to explain the former but not the latter (*Pickering* v. *Pickering*, 50 N. H. 349), may admit of some doubt; but when the equivocation or ambiguity arises in the application of the testator's language to the subject-matter of the bequest or devise or to the identification of the legatee or devisee, some evidence of intention becomes necessary to sustain the will. The same necessity may exist in the construction of written contracts. In *Kimball* v. *Waterman*, 73 N. H. 348, 349 it is said: "The contract upon its face is unambiguous; but when an attempt is made to apply it to the facts and circumstances surrounding the parties at the time it was made, it is found that there are two or more lots or areas of pine timber on each tract of land which answer its terms. In other words, there is a latent ambiguity which permits the introduction of oral testimony to show what lot or area of pine on each tract of land was intended to be sold." "The present is not a case of latent ambiguity, for the reasons already stated. . . . When the will comes to be applied, there are found to be two societies; one rightly named and described, the other not. There is then no ambiguity as to the society intended by the will. It is the offer of proof of intent *aliunde* which creates the doubt, and this is clearly inadmissible, under the rule applicable to such a case." *Tucker* v. *Society*, 7 Met. 188, 210; *Trustees &c.* v. *Peaslee*, 15 N. H. 317; *Brown* v. *Brown*, 43 N. H. 17.

Whether there is an ambiguity calling for explanation is clearly a question of fact, upon which in a given case different courts might reach different conclusions. And much of the apparent conflict in the cases is due to the inability of all men to weigh the evidence, tending to show an ambiguity, in the same way. In *Stevens* v. *Underhill*, 67 N. H. 68 the opinion of the court is based upon the finding that "the testator's intent is left in doubt" (*p.* 71), while the dissenting opinion proceeds upon a finding that the language of the will is clear, explicit and unambiguous. See, also, *Harris* v. *Ingalls*, 74 N. H. 35; *S. C.*, 74 N. H. 339.

In the case under consideration there is no ambiguity either in the language used by the testator or in its application to surrounding circumstances. "The heirs of my late husband" adequately describe a class and when concretely applied there is no doubt as to the particular person who answers the testatrix's description. The words do not apply to or include nephews and nieces, and to construe

the will in that sense would be to flatly contradict the clearly expressed intention of the testatrix, and to substitute therefor her extrinsic declaration to the contrary. If the principle of law that a will cannot be contradicted by other evidence is sound, there is no escape from the conclusion that her declarations that she intended the word "heirs" should mean nephews and nieces cannot be considered in construing her will.

The remarks of Prof. Wigmore in his work on evidence (vol. 4, s. 2471) are pertinent: "For example if there is a devise to 'Benjamin Franklin of Boston, my nephew,' and there is no nephew but one John Franklin, a letter of the testator to that nephew, declaring an intent to devise to him his property, would not be considered. This rule has never been questioned. What is the reason for it? The reason is certainly not to be found in any prohibitory rule of evidence, for such declarations are admissible under the Hearsay exception (ante, ss. 1725, 1735). Nor is it that these declarations are not useful, for together with others they would certainly help to throw light on the question whether (as in the above example) the name 'Benjamin Franklin' was by the testator habitually applied to designate the nephew. The true reason is found in another rule, already considered,—the rule which prohibits setting up any extrinsic utterance to compete with and overthrow the words of a document which solely embodies the transaction (ante, s. 2425). The effect of that rule is to deny any legal effect to just such declarations." This doctrine is strongly endorsed in this state. *Perkins* v. *Mathes*, 49 N. H. 107; *Ordway* v. *Dow*, 55 N. H. 11; *Utley* v. *Titcomb*, 63 N. H. 129; *Emery* v. *Haven*, 67 N. H. 503; *Stevens* v. *Stevens*, 72 N. H. 360; *Ladd* v. *Ladd*, 74 N. H. 380; *Shapleigh* v. *Shapleigh*, 69 N. H. 577.

In *Lester's Estate*, 115 Ia. 1, an attempt was made to show by the testator's contemporaneous declarations that "heirs at law" as used in his will had a peculiar meaning. But the court in holding that the evidence was inadmissible say: "While it may be true that the word 'heir' is subject to explanation or qualification, the explaining and qualifying language must be found in the instrument itself. The term 'heirs at law,' not explained or qualified by other language in the will, has a perfectly definite meaning, which cannot be changed by proof outside of the will itself. No authorities need be cited in support of a proposition which is so well established." In making a similar ruling in *Wood* v. *Hammond*, 16 R. I. 98, 114 the court remark: "The effort is to impose upon the will by extrinsic testimony

a meaning which, taking it as it naturally applies to existing facts and circumstances, it does not express. It is an effort which contravenes the fundamental requirement of the law that a will shall be in writing; that is, that it shall be a *written expression* of the testator's intention." For other cases of similar import see *Root's Estate,* 187 Pa. St. 118; *Denfield, Petitioner,* 156 Mass. 265; *Forbes* v. *Darling,* 94 Mich. 621; *Willard* v. *Darrah,* 168 Mo. 660; *Suman* v. *Harvey,* 114 Md. 241, — 47 L. R. A. (N. S.) 540, note *g.*

The following cases referred to in argument do not support the contention that a written document whose meaning is clear as applied to the circumstances may be contradicted by proof that such apparent meaning was not intended by the parties: *State* v. *Collins,* 68 N. H. 299; *Locke* v. *Rowell,* 47 N. H. 46; *Gill* v. *Ferrin,* 71 N. H. 421; *Day* v. *Towns,* 76 N. H. 200; *Atto* v. *Saunders,* 77 N. H. 527; *Winnipisseogee Co.* v. *Perley,* 46 N. H. 83; *Salmon Falls Co.* v. *Portsmouth Co.,* 46 N. H. 249. These are cases of written contracts the terms of which were found to be of doubtful import, and extrinsic evidence was admitted to remove the doubt and to give effect to the parties' intention. This was the theory upon which they were decided. Whether everybody would agree that the finding of ambiguity in a given case is correct is immaterial, since it is in each case a preliminary finding of fact, involving no question of law. Other cases where the foregoing principles have been applied to written contracts are *Bell* v. *Woodward,* 46 N. H. 315; *Meredith Association* v. *Drill Co.,* 66 N. H. 267; *Bartlett* v. *LaRochelle,* 68 N. H. 211; *Gill* v. *Ferrin,* 71 N. H. 421; *Eastman* v. *Association,* 62 N. H. 555.

As the words "heirs of my deceased husband" present no difficulty of application, the fact that the testatrix orally gave to them at the time she executed the will a forced and unusual meaning is immaterial upon the question of their interpretation, however important it might be if the question were one relating to the reformation of the will on the ground of mistake. *Lancaster &c. Elec. Light Co.* v. *Jones,* 75 N. H. 172; *McIsaac* v. *McMurray,* 77 N. H. 466, 468, 469. It is conceded, however, that the reformation of a will is not within the usual powers of the court. Page Wills, s. 809. Nor is it competent for the court "to make a will for the testator upon the mere conjecture that he may have inadvertently or without full consideration failed to apprehend the force and effect of his language" (*McAllister* v. *Hayes,* 76 N. H. 108, 110); still less, can it violate a rule of substantive law by reading into the

will language expressive of an entirely different purpose from that disclosed by the clear language of the will.

In refusing to consider the proffered declarations of the testatrix upon the question of her intention the court committed no error.

*The former result is affirmed.*

All concurred.