Florentino Fuentes Suárez, et al., Plaintiffs and Appellees-Appellants, v. The Federal Land Bank of Baltimore, Defendant and Appellant-Appellee.

No. 8940. Argued June 16, 1944.—Decided December 4, 1944.

*Frank Martínez, S. García Díaz,* and *M. A. García del Rosario,* for defendant and appellant-appellee. *E. Martínez Rivera* for plaintiffs and appellees-appellants.

MR. JUSTICE DE JESÚS delivered the opinion of the court.

The Federal Land Bank of Baltimore loaned $6,000 to Abdón Fuentes and his wife Rosalía Suárez. They issued a note in favor of the bank for the above sum and in order to secure the same executed on June 10, 1924, a voluntary mortgage in favor of the bank on a property situated in the ward of Palos Blancos of Corozal. It was agreed that the amount loaned would be paid in twenty annual installments, the first nineteen of $523.30 each and the last one of $519.76, and that the first installment would become due on July 1, 1925, and the succeeding ones on July 1st of each year, with interest on each installment at the legal rate of 6 per cent per annum. It was further stipulated that in case of default in the payment of the mortgage debt or any part thereof at maturity, the whole debt would be considered due. Fuentes paid the installments corresponding to the years 1925, 1926, 1927, and 1928, but he died on September 20 of the latter year and since then his heirs have failed to pay the mortgage installments and the taxes on the property. On October 1, 1930, the bank instituted in the District Court of Bayamón a foreclosure proceeding to collect the debt which amounted at that time to $6,408.02, including $500 as attorney's fees in case of execution. In the foreclosure proceeding payment was demanded from the estate of Abdón Fuentes composed of his widow and children. At a public sale held on February 6, 1931, the property was adjudicated to the bank for

the amount of $6,000 including the costs, expenses, and attorney's fees incurred in the proceeding, as well as the amount of taxes owed according to the memorandum submitted by the Collector of Internal Revenue of Corozal. By deed No. 72 of March 25, 1938, the bank sold the property to José Manuel Medina for $4,100.

In October 1940, the plaintiffs, as heirs of Abdón Fuentes and Rosalía Suárez, instituted this proceeding against the bank wherein they sought the annulment of the mortgage debt of $6,000 and of the foreclosure proceeding, specially the adjudication of the property to the bank and that the plaintiffs be adjudged to pay the amount of $15,000 which they allege is the value of the mortgaged property, $3,000 for fruits yielded or that should have been yielded since February 6, 1931, together with costs, expenses, and attorney's fees.

As a ground for the annulment of the debt of $6,000, plaintiffs alleged that Fuentes, at the time he executed the note and the mortgage deed,[1] was suffering from progressive paresis, was insane, and therefore, could not have given his valid consent to the execution of those documents. It was further alleged by plaintiff María Teresa Suárez, as sole heir of her mother Carmen Fuentes—who in turn was heir of her parents Abdón Fuentes and Rosalía Suárez—that when Carmen Fuentes was required to make payment in the mortgage foreclosure proceeding she was suffering from mental derangement, a circumstance which, as alleged in the complaint, was known to the bank, and, therefore, that the court did not acquire jurisdiction over said defendant.

The trial judge found that Fuentes had been insane, suffering from progressive general paralysis, from 1921 until

[1] Although the parties and the trial court referred to the note as having been executed on June 2, 1924, the fact is, that even though dated June 2, 1924, it was executed in Corozal on June 10, as it was accordingly certified by the notary in the jurat at the foot of the document, having signed as witnesses to the marks of Abdón Fuentes and Rosalía Suárez, Messrs. Juan del Fresno and Antonio Valiente, who in turn were the instrumental witnesses of the mortgage deed which was executed on that same day and before that same notary in Corozal by Fuentes and his wife.

his death, and as a consequence thereof he concluded that both the loan executed on June 10, 1924, and the foreclosure proceedings were void; he also found that the value of the land when adjudicated to the bank was $6,000; and he entered judgment ordering the defendant to pay to the plaintiffs $6,000 for the land, $8,337.36 for fruits produced or which should have been produced (said $8,337.36 being the balance after deducting the taxes paid by the bank from October 31, 1940—date of service of summons—to November 30, 1943—date of the judgment), with costs and expenses, and $400 as attorney's fees.

Both parties have appealed from that judgment.

The fundamental question to be determined in this appeal is whether Fuentes was sane on June 10, 1924, when he executed the note and the mortgage deed. If he was, we must then decide if, as alleged in the third cause of action, Carmen Fuentes was insane at the time that she was served with process in the foreclosure proceeding, and in the event she was, then we must determine the effect of her mental derangement on the validity of the foreclosure proceeding. If the questions thus raised are decided in favor of the defendant, we do not have to pass upon the other questions set up by the parties.

■■ Section 1213 of the Civil Code provides that the consent of the contracting parties is one of the indispensable requisites for the existence of a contract, and § 1215 provides that lunatics or insane persons can not give consent. But since according to § 1214, consent is shown by the concurrence of offer and acceptance with respect to the thing and the consideration which are to constitute the contract, it is at that very moment when the meeting of the minds takes place that the capacity to give consent must exist. This being so, if the alleged insane person has one of his lucid intervals when the meeting of the minds takes place, the contract is valid even though before or after such interval the contracting party should

have been lunatic or insane. "Since there are certain periods in insanity, . . . " Manresa says, "known as 'lucid intervals,' it may be asked whether during those periods the incapacity ceases, and although the law does not expressly say so, it may be answered affirmatively, either because when the cause ceases the effect should also cease, or because in other fundamental acts of civil life [wills, for instance], the lawmaker acknowledges the validity of an act performed during such moments of lucidity." *Comentarios al Código Civil Español,* vol. 8, p. 640. See also Sánchez Román, *Derecho Civil,* vol. 4, p. 187.

The plaintiffs' evidence shows that on May 17, 1921, Fuentes entered the Presbyterian Hospital at Santurce, to undergo an hernia operation which was entirely successful; that on the fifth day after the operation, he became raving mad and was so violent that he had to be taken out of the hospital and carried to his home; that he was confined in the Insular Insane Asylum on June 4, 1921, and left on the following September 1, because he had grown better of his mental disease, according to a certificate from the Superintendent of the Asylum dated August 30, 1921; that on June 13, 1922, he was again confined in the asylum and left on September 9 of that same year, at the request of his family, because he got better from his mental disease, according to a certificate of the Superintendent of the Asylum dated September 9, 1922; that on June 27 of that same year the District Court of San Juan, on the petition of Rosalía Suárez, in civil case No. 1065 "incapacity and appointment of a guardian," declared him incapacitated because of mental derangement, and appointed a guardian to manage his person and property; that on April 19, 1923, the district court rehabilitated him to the management of his own property, bringing to an end the guardianship because "he was sane."

Dr. Urbano Ramírez, plaintiffs' witness who attended Fuentes since 1921 when said physician established his of-

fice in Corozal, testified that after Fuentes left the asylum he had lucid intervals during which he behaved as a normal person; that even though at his death he had not recovered from his mental derangement, yet, at that time, he had lucid intervals; and that as a rule those lucid intervals may last two, three, four, or six months.

Dr. Ramón Sifre, who testified for the plaintiffs, stated that he did not remember having attended Fuentes before 1928, but that on said year he was called in consultation by Dr. Ramírez to see Fuentes who had pneumonia, and that he realized that the patient was suffering from an advanced stage of paretic neurosyphilis, known also as paretic dementia or general paralysis, and that the disease dated back a number of years. Referring to the lucid intervals which occur in that disease, he stated that, according to the medical literature he had read, there are lucid intervals which last over one year; that these intervals may appear without treatment, and that the lucidity may be so complete that the person may return to his occupation and engage in his former mental activities as any normal being. Finally, upon being questioned by counsel for plaintiffs, he answered that a person suffering from paresis may by his conduct seem to be normal, even though he is not so.

Dr. Luis Manuel Morales, specialist in neuro-psychiatry, called by defendant, testified that in his twelve years of experience he has come in contact with more than one hundred cases of paresis, and after stating the symptoms of the disease, he said that the latter is characterized by periodicity; that those periods may last one day or many years, and that it has the peculiar trait that during those intervals the symptoms of the disease apparently disappear and the person again feels as before his illness; that at times the intervals occur spontaneously, without any treatment, and he related cases in his personal experience wherein the symptoms of the disease had disappeared and the person had been able

to return to normalcy and often actively engaged for many years in some useful work.

It having been established that the insanity suffered by Fuentes from 1921 until his death was characterized by lucid intervals which started after he left the Insane Asylum and were repeated thereafter, even at the time of his death, let us now see whether Fuentes had one of those lucid intervals which restored his capacity to contract when on June 10, 1924, he executed the promissory note and the mortgage deed.

We should not overlook the fact that, at the time the plaintiffs brought this action, more than sixteen years had elapsed since Fuentes executed the documents, and about ten years since the property was adjudicated to the bank in the foreclosure proceeding. Evidently, the unjustified delay of the plaintiffs has placed the defendant in a disadvantageous position. Their delay in the institution of this action deprived defendant of the notary's testimony as the latter died before this suit was brought. Undoubtedly his testimony would have shed much light as to Fuentes' mental condition at the time the latter executed the documents which are now challenged by the plaintiffs. Rosalía Suárez is also dead, and she could have testified on that same point. This disadvantageous position brought about by the plaintiffs should be taken into account when weighing the evidence.

The fact that the house of Aurelia Fuentes was chosen for the signing of the deed is an indication that the bank acted with clean hands. There was no secrecy at the time of signing the documents. The evidence does not show affirmatively that Aurelia Fuentes was at home at that time. Nevertheless, since it appears that her parents who lived in the country came to sign the documents at her city home, and considering the importance that that act had for her parents, and even for herself, it should be very significant that on such an occasion Aurelia Fuentes were not present. But al-

though she is a party to this suit and, from what may be inferred, it is likely that she was present, yet, she did not testify at the trial either to deny that she was present or to tell her observations about her father's behavior on that occasion, if in fact she was present.

One of the subscribing witnesses, Juan del Fresno, testified that the execution of the documents took place at the house of Aurelia Fuentes in Corozal at 3:00 o'clock in the afternoon; that the notary read the deed aloud to Fuentes, to his wife, and to the witness, and asked Fuentes if it was agreeable to him, to which the latter answered in the affirmative; that Fresno, at the request of Fuentes and of the notary, signed for the former, because he did not know how to sign; that the act of signing the deed lasted about half an hour; that he did not notice anything wrong with Fuentes; that in his opinion Fuentes was aware of what he was doing and that none of his relatives objected to the signing of the deed.

The other subscribing witness, Antonio Valiente, testified that after the notary arrived at the house of Aurelia Fuentes, he and Fresno were called to act as witnesses; that he signed for Rosalía Suárez, who did not know how to sign; and that at the time of the execution of the deed, he noticed that Fuentes acted normally and hardly spoke at that act.

Notwithstanding the evidence which we have just copied, the trial court reached the conclusion that the defendant had not proved that Fuentes had a lucid interval at the time that he executed the note and the mortgage deed. Let us now examine the reasoning of the court which led it to such a conclusion:

"In the specific case of Abdón Fuentes, the longest period of remission according to the evidence was for nine months, that is, from September 1, 1921, when he was discharged from the Insular Asylum, until June 13, 1922, when he again had to be confined therein.

"Dr. Morales, however, was of the opinion that if the questions set forth on the printed form for application for the loan were answered by Fuentes personally, he was of a clear and sound mind, had no gross defects in his memory, and the condition of his mind was sufficiently normal to make him aware of what he was doing.

"Naturally, the opinion of the distinguished doctor is principally based on the fact that Abdón Fuentes answered those questions personally; but we must remember that to prove said point no direct evidence was introduced but only by inference, adducing evidence to show that, according to the custom and use of the bank, Abdón Fuentes must have answered the questions personally. This kind of evidence did not convince us.

"We shall admit, however, that on March 3, 1924, when Abdón Fuentes signed the above-mentioned application, he was in a period of remission which began on April 19, 1923. May we infer from that fact that he was in the same state of mental lucidity three months later, that is, on June 2 and 10 of said year [2] at the time of the execution of the loan and mortgage contracts? We must answer in the negative because the evidence in this particular was to the contrary. Dr. Morales, when testifying on this point, said that he could not reach a definite conclusion as to the mental state of Abdón Fuentes when he executed the deed, that probably the remission persisted, but that he could not tell to what degree without seeing the patient.

"The statements of both subscribing witnesses to the effect that nothing abnormal occurred at the execution of the mortgage deed do not carry great weight in our mind, specially when, as testified by Dr. Sifre, a person who suffers from 'paresis' or paretic neurosyphilis may seem by his acts and conduct to have a lucid interval without it actually being so.

"(2) Taking into account the evidence which we have just analyzed, our second conclusion is that said evidence does not support the allegation that Abdón Fuentes was in a state of mental lucidity at the time of executing said loan and mortgage contracts. Admitting, however, that the defendant has presumptively established that Abdón Fuentes was mentally lucid when he executed said contracts, plaintiffs' evidence—which on that point was introduced prior to defendant's—to the effect that the state of insanity of Abdón Fuentes was continuous and persistent from 1921 to 1928 when he died, destroyed the effect of such presumption."

---

[2] See footnote 1, *ante*, p. 195.

The trial court gave no weight to the opinion of Dr. Morales to the effect that when Fuentes swore the loan application he was of sound mind. It gave it no credit because the alienist's opinion was grounded mainly on the fact that the questions contained in the application were answered by Fuentes personally, and the evidence which was adduced to prove that Fuentes had answered them did not satify the court because it was indirect evidence. The indirect evidence to which the lower court refers was the testimony of Notary Francisco Acevedo to the effect that since 1923 he was doing for the defendant in Aguadilla the same work which Notary Crosas did for defendant in San Juan; that the practice of the bank in filling a loan application when the applicant did not know how to sign, consisted in that the latter appeared personally before the bank's notary and answered the questions as the notary read them to him.

If we take into account that the questions on the application were answered on March 3, 1924, and that the trial of this case began on May 12, 1942, that is, 18 years after the application was sworn; if we realize that at that time the two persons who had direct participation in filling the applicaton, Notary Crosas and Fuentes (Abdón) had already died, how can the defendant be required to offer a direct evidence which it is physically impossible to offer? The only evidence which the bank could have offered and did offer was admissible, pursuant to subdivision 13 of § 35 of the Law of Evidence, which provides that evidence may be introduced at the trial of "any other facts from which the facts in issue are presumed or are logically inferable." If the practice to which the witness Acevedo referred was followed by the bank, and his testimony was at no time controverted, and if plaintiffs introduced no evidence tending to deny that Fuentes personally answered the questions, it should be presumed that the ordinary course of business was followed (subdivision 20, § 102 of the Law of Evidence) and,

therefore, that the practice established by the bank was also followed in the case of Fuentes. Abbott, Proof of Facts, 4th. ed. p. 574; Wigmore on Evidence, 3rd. ed., §§ 92 and 93; *Berthold–Jennings Lumber Co.* v. *St. Louis, I. M. & S. Ry. Co.,* 80 F. (2d) 32, 44; *Buxton* v. *Langan,* 3 A (2d) 647, 648; *Shearer* v. *Pacific Gas & Electric Co.,* 110 P. (2d) 690, 692; *Jones* v. *Teasley,* 105 S.E. 46, 48; and *Jones* v. *Bennett,* 99 A. 18, 20. Under those circumstances, the court erred in failing to give credit to that evidence.

The court also erred in considering that the testimony of Dr. Morales was contrary to defendant's contention that Fuentes had a lucid interval at the time of executing the mortgage deed. The words of the alienist were, ''I should presume that a person who is in remission of a general paralysis and that on April 24 fills this questionnaire [he refers to the application for the loan] and behaves in that manner a month later [he means the execution of the mortgage deed], *probably the remission still persists.* That is the most that I can say, and as to the degree I can not tell without seeing the patient.'' (Italics ours.)

We can not conceive how the trial judge could have reached the conclusion that that statement of Dr. Morales was contrary to the existence of a lucid interval. Naturally, it was impossible for the alienist to specify the degree of lucidity without seeing the patient, but in his opinion, it could be presumed that the lucid interval enjoyed by Fuentes continued at the time that he swore the application for the loan.

As we have seen, the judge states that the testimony of the two instrumental witnesses in regard to the conduct of Fuentes during the execution of the deed does not carry great weight, inasmuch as Dr. Sifre testified that a person suffering from paresis may seem by his acts and conduct to have a lucid interval while it is not so. We accept the possibility that the subscribing witnesses could have been mistaken in regarding as lucid the state of insanity of Fuentes.

But to err is human. Even the alienists themselves differ in their opinions with regard to the insanity or sanity of a patient. If we were to accept the judge's opinion on this point the existence of a lucid interval could never be proved, as there would always exist the possibility of error. Precisely, keeping in mind the frailty of human nature, § 4 of the Law of Evidence provides:

"The law does not require demonstration; that is, *such a degree of proof as, excluding possibility of error, produces absolute certainty;* because such proof is rarely possible. Moral certainty only is required, or that degree of proof which produces conviction in an unprejudiced mind." (Italics ours.)

The trial judge concludes that admitting that the defendant has established *prima facie* that Fuentes was in a lucid state of mind when he executed the note and the mortgage deed, plaintiffs' evidence "to the effect that the state of insanity of Abdón Fuentes was continuous and persistent from 1921 to 1928 when he died, destroyed the *prima facie* case." This conclusion is inconsistent with that part of the opinion of the trial judge which says: "In the specific case of Abdón Fuentes, the longest period of remission, *according to the evidence,* was for nine months." (Italics ours.) It is also inconsistent with that other part of the opinion which admits that Fuentes had another period of remission which began about April 19, 1923, that is, at the beginning of his rehabilitation. But aside from these inconsistencies, we find that the evidence of the plaintiffs on this point, which the trial court believed, consisted in the testimony of plaintiffs Francisca and Manuela Fuentes and of Domingo Antonio Hernández, son-in-law of Fuentes. These witnesses explained their observations as to how Fuentes behaved in his daily life from 1921 until his death and they stated that he had never had any lucid interval. If the judge believed the testimony of the expert witnesses, plaintiffs' as well as defendant's, to the effect that the disease suffered by Fuentes was

characterized by lucid intervals; if he believed the testimony of Dr. Ramírez, the plaintiffs' own witness, with respect to the lucid intervals which he had observed in Fuentes at different times after he left the asylum for the second time on September 9, 1922, until his death; if the judge himself, in the course of his opinion, states that there was a lucid interval which continued from the date on which Fuentes left the asylum for the first time until he was confined for the second time; if he admits the existence of an order of the district court rehabilitating Fuentes, how is it possible that he can believe those three witnesses for the plaintiffs who testified that Fuentes never had a lucid interval? Evidently, such a conclusive evidence as this, specially the order of rehabilitation, could not be destroyed by the testimony of the three above-mentioned witnesses.

For the aforesaid reasons we must reach the conclusion that the judge of the lower court erred in finding that when Fuentes executed the note and the mortgage deed he was not enjoying a lucid interval, and in annulling the contract.

Let us now pass upon the second question, that is, whether the fact that Carmen Fuentes was insane at the time she was served with process in the mortgage foreclosure proceeding avoids said proceeding.

The plaintiffs have sufficiently proved that Carmen Fuentes was insane when she was served with process in the foreclosure proceeding. However, she was never judicially incapacitated. This being so subdivision 4 of § 93 of the Code of Civil Procedure does not obtain in the service of process in the foreclosure proceeding which confines its provision to the manner of summoning a person who has been judicially declared to be of unsound mind, but since there is no special law providing the procedure to summon an insane person who has not been declared incapacitated, the service of summons in the foreclosure proceeding must follow so far as possible, the general rule provided by subdivision 6 of § 93,

as it was done in the present case. The demand thus made is valid and sufficient to vest the court with jurisdiction, and consequently it did not avoid the foreclosure proceeding. *Subirana* v. *Cortada,* 38 P.R.R. 183; *Olivera* v. *Grace,* (Cal., 1942) 122 P. (2d) 564, 140 A.L.R. 1328, and authorities cited therein.

In the United States the courts of equity, although holding that the service of process on an insane person who has not been judicially incapacitated is not void nor even voidable, yet they grant a remedy to the insane, setting aside the judgment when there has been fraud or when the plaintiff has obtained an undue advantage over the insane or when the judgment is unfair or contrary to the evidence. But the general rule is, that equity will not interfere unless it appears that the insane person has a meritorious defense or that a new result would be reached if judgment were vacated and he were given an opportunity to be heard. Annotations in 34 A.L.R. 221, 140 A.L.R. 1336.

In the present case the bank did not take any undue advantage over the insane person. The debt claimed was legitimate and the adjudication of the property to the bank for the amount of $6,000 did not prejudice Carmen Fuentes at all, inasmuch as the trial judge himself found that the property at the time of being adjudicated in the foreclosure proceeding was worth $6,000. Furthermore, the bank after taking steps for the sale of the property for sometime, could not obtain a higher price than the one paid by José Manuel Medina on March 25, 1938, that is, $4,100.

For the foregoing reasons the judgment appealed from must be reversed and another rendered instead in favor of the defendant, with costs.